# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROBBIN THAXTON, | : | Case No. 3:17-cv-68 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Robbin Thaxton brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. She applied for benefits on August 30, 2012, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Emily Ruth Statum concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The Appeals Council denied Plaintiff's request for review, and she filed a previous action in United States District Court for the Southern District of Ohio. *See Thaxton v. Comm'r of Soc. Sec.*, 3:15-cv-352, Doc. #s 8-9 (S.D. Ohio April 21, 2016). Upon the parties' Joint Motion to Remand to the Commissioner, the Court vacated the

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Commissioner's decision and remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. *Id*. Upon remand, ALJ Gregory G. Kenyon determined that Plaintiff was not eligible for benefits because she is not under a disability.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), and the administrative record (Doc. #s 6-7).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II.  **Background**

Plaintiff asserts that she has been under a "disability" since January 31, 2008. She was forty-three years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has since turned fifty years old and is accordingly considered a person "closely approaching advanced age." *See id.* §§ 404.1563(d), 416.963(d). She has a limited education. *See id.* §§ 404.1564(b)(3), 416.964(b)(3). [2]

### A.  **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Kenyon that she has an extra vertebra in her lower back that pinches the nerves and causes sharp pain in her lower back. (Doc.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

#7, *PageID* #648-49).  On a scale from one to ten, her pain is at ten most of the time.  *Id.* at 649.  She sometimes has to lie on the floor with her knees up to ease the pain in her back.  *Id.* at 648.  Before she goes to sleep, she gets into her Jacuzzi tub to help with the pain.  *Id.* at 649.  It does not bother her as much when she is sleeping and relaxed.  *Id.*  She also uses a heating pad and takes over-the-counter medications.  *Id.* at 650.  She saw a chiropractor for two weeks but stopped because it was causing her more pain.  *Id.*

She also has burning pain in her upper back between her shoulder blades.  *Id.* at 648-49.  If she walks too far, she has to stop and bend down on her knees to ease the pain.  *Id.* at 648.

Additionally, Plaintiff has pain in her knees.  *Id.* at 650.  On a ten-point scale, her knee pain is between six to seven.  *Id.* at 651.  "I had bad … cartilage in my kneecaps and my kneecaps will go from the front clear around to the back and it brings me to the ground."  *Id.* at 650.  That usually happens once or twice a month.  *Id.*  Her knees swell up about twice a day, and she puts heat on them to reduce the swelling.  *Id.* at 650, 657.

Plaintiff struggles with depression.  *Id.* at 651.  At least for or five times a week, she "want[s] to sit and cry all the time."  *Id.*  She also isolates herself in her room.  *Id.*  She sometimes has trouble interacting with other people.  *Id.*  For example, she goes off on her family three or four times a week "sometimes for no reason at all."  *Id.*  She has also gone off on a person at the trailer park and people at the grocery store.  *Id.* at 652.  She also hears voices and music at nighttime four or five times per week.  *Id.* at 652-53.

Plaintiff only went to school through the eighth grade.  *Id.* at 646.  While in school, she was in special education classes.  *Id.*  She cannot comprehend what she reads

and sometimes has trouble figuring out or pronouncing words. *Id.* She struggles with helping her granddaughter—who is in the first grade—with her homework. *Id.* She also has trouble with math. *Id.* at 647.

Plaintiff lives with her husband, her thirty-year-old daughter, and seven and thirteen-year old granddaughters in a doublewide trailer. *Id.* at 644-45, 659-60. She also has two adult sons. *Id.* at 644. She spends an ordinary day sitting in her recliner with her feet propped up and a pillow behind her back. *Id.* at 654-55. Her daughter does the housework, laundry, and cleaning. *Id.* at 645. The only chore Plaintiff does is make her bed—and that takes her between twenty and thirty minutes because she has to take breaks in between. *Id.* at 655-56.

Plaintiff has a driver's license and usually drives once or twice a week. *Id.* at 645. She cannot lift anything heavier than a gallon of milk. *Id.* at 653. She is able to stand in one spot for five minutes before needing to sit down. *Id.* at 654. She can walk around the block but has to stop two or three times to bend down. This eases the burning in her back. *Id.* She can sit for about thirty minutes before she needs to stand up and walk around for two to three minutes. *Id.* at 654, 656.

### B. Medical Opinions

#### i. James Wilcher, D.O.

Plaintiff's treating physician, Dr. Wilcher, provided several opinions. In April 2015, he opined that Plaintiff is "unable to work due to back pain." *Id.* at 1030. A little more than one year later, in May 2016, he indicated that Plaintiff "is unable to work for 12 mo[nths]." *Id.* at 1029.

In October 2013 and October 2016, Dr. Wilcher completed medical-impairment questionnaires with almost identical responses. (Doc. #6, *PageID* #s 516-17); (Doc. #7, *PageID* #s 1027-28). He diagnosed hypertension and arthritis in her back, shoulder, and knees. (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027). She experiences moderate pain in her back, shoulders, and knees and her treatment includes NSAIDS and exercise. (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027).

Dr. Wilcher opined Plaintiff could stand for thirty minutes at one time, sit for two hours, and work for four hours per day. (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027). She can frequently lift ten pounds and can occasionally bend, stoop, balance, and raise her arms over shoulder level. (Doc. #6, *PageID* #s 516-17); (Doc. #7, *PageID* #s 1027-28). She needs to elevate her legs occasionally during an eight-hour workday. (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027).

### ii. Pravesh Patel, M.D.

Dr. Patel, Plaintiff's psychiatrist, completed a mental-impairment questionnaire in February 2014. (Doc. #7, *PageID* #s 827-30). He diagnosed depressive disorder, anxiety disorder not otherwise specified (NOS), and mood disorder. *Id.* at 827. She is responding well to medication—Wellbutrin, Remeron, and hydroxyzine. *Id.* at 828. However, her prognosis is guarded. *Id.*

Dr. Patel identified some of Plaintiff's signs and symptoms including, for example, poor memory, sleep disturbance, emotional lability, feelings of guilt/worthlessness, perceptual disturbances, and decreased energy. *Id.* at 827. She also has an anxious mood and affect, trouble focusing, mood swings at times, and a tendency

to get irritable easily. *Id.* at 828. Dr. Patel opined that Plaintiff's impairments and treatment would cause her to be absent from work more than three times per month. *Id.* at 829. And, Plaintiff's psychiatric condition "will decrease [her] pain threshold." *Id.* at 828.

Dr. Patel opined that Plaintiff is markedly impaired in her ability to carry out very detailed instructions, maintain concentration and attention for extended periods, respond appropriately to changes in the work setting, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 829-30. She is moderately impaired in most other areas, including for example, her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, make simple work-related decisions, and set realistic goals or make plans independently of others. *Id.*

### iii.    Damian M. Danopulos, M.D.

Dr. Danopulos examined Plaintiff in December 2012. (Doc. #6, *PageID* #s 346-56). His "objective findings were: 1) Lumbar spine mild arthritic changes, 2) Cervical spine arthralgias, 3) Left knee mild arthritic changes, 4) Well-controlled hypertension, and 5) Exogenous versus morbid obesity." *Id.* at 349. He opined, "Her ability to do any work-related activities is affected from the combination of her lumbar spine and left knee early arthritic changes and her cervical spine arthralgias. Her well-controlled hypertension and her exogenous versus morbid obesity are additional problems." *Id.* at 350.

### iv.     Mary Ann Jones, Ph.D.

In January 2013, Dr. Jones evaluated Plaintiff and administered the Weschler (WAIS-VI). *Id.* at 466-73. On the WAIS-IV, Plaintiff received a full-scale intelligent quotient of 64, a verbal comprehension index of 66, and working memory index of 66—all of which fall into the mild range of mental retardation. *Id.* at 470. Further, she achieved a perceptual reasoning index of 75 and a processing speed index of 71—both of which fall into the borderline range of mental retardation. *Id.*

Dr. Jones diagnosed Plaintiff with dysthymic disorder; psychological factors affecting physical condition; and mild mental retardation. *Id.* at 471. She opined Plaintiff would "likely … have some limitations in understanding, remembering, and carrying out instructions in a work setting." *Id.* "It is likely that she has some mild to moderate limitations in her ability to sustain attention and concentration and to maintain appropriate persistence and pace in order to perform work tasks." *Id.* at 472. Although Plaintiff reported that she did not always cope well with stress in work settings, "[t]here is no reported history of mental or emotional deterioration in response to work exposure." *Id.*

### v.     Aracelis Rivera, Psy.D., & Irma Johnston, Psy.D.

Dr. Rivera reviewed Plaintiff's records on January 22, 2013. *Id.* at 94-105. She found that Plaintiff has three severe impairments: dysfunction in major joints, borderline intellectual functioning, and somatoform disorders. *Id.* at 98. She has a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes

of decompensation. *Id.* Dr. Rivera opined that Plaintiff "appears to be capable" of understanding, recalling, and carrying out simple one to three step instructions in a job that does not require fast-pace work. *Id.* at 102-03. "She can adapt to routine changes within the work environments, [and] would not respond well to rapidly changing work environments." *Id.* at 103.

On June 29, 2013, Dr. Johnston reviewed Plaintiff's records. *Id.* at 122-36. Dr. Johnston opined Plaintiff had a moderate restriction of activities of daily living, and she affirmed the remainder of Dr. Rivera's assessment. *Id.*

### vi. Teresita Cruz, M.D., & Bruce Mirvis, M.D.

On December 27, 2012, Dr. Cruz reviewed Plaintiff's records. *Id.* at 94-105. She opined Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. *Id.* at 100-01. She could stand and/or walk for six hours in an eight-hour day and sit for six hours. *Id.* at 101. Plaintiff can occasionally kneel and climb ladders, ropes, and scaffolds, and can frequently stoop, crouch, or crawl. *Id.* Dr. Cruz concluded that she is not under a disability. *Id.* at 105.

Dr. Mirvis reviewed Plaintiff's records on June 26, 2013 and affirmed Dr. Cruz's assessment. *Id.* at 122-36. He added that Plaintiff should avoid concentrated exposure to hazards such as machinery or heights. *Id.* at 131.

## III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42

U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.  <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since January 31, 2008.

Step 2:     She has the severe impairments of (mild) degenerative disc disease of the lumbosacral spine, (mild) degenerative joint disease of the left knee, borderline intellectual functioning, and an affective (depressive) disorder.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "medium work … subject to the following additional limitations: (1) no more than frequent crouching, crawling, kneeling, stooping, or climbing of ramps or stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) limited to performing unskilled, simple, repetitive tasks."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #7, *PageID* #s 579-98). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 598.

## V.     Discussion

Plaintiff contends that the ALJ erred in his weighing of the medical opinions. Further, the ALJ's residual functional capacity (RFC) finding fails to reasonably reflect her mental impairments. The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the medical opinions and his RFC assessment.

### A.     Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

*Dr. Wilcher*

Under the treating physician rule, ALJ Kenyon found that Dr. Wilcher's opinions concerning Plaintiff's extent of limitation could not be assigned controlling or deferential weight. (Doc. #7, *PageID* #s 592-93). He determined that Dr. Wilcher's opinion could not meet either prong: "His conclusions are entirely unsupported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial evidence in the case record." *Id.*

Plaintiff asserts that the ALJ's conclusion that Dr. Wilcher's opinions are "entirely unsupported" is incorrect, as the ALJ himself found that Plaintiff had several severe impairments—including degenerative disc disease of the lumbosacral spine and

12

degenerative joint disease of the left knee—suggesting that there was at least some evidence to support Dr. Wilcher's conclusions. Although Plaintiff is correct that the ALJ's statement is general and perhaps overstated, as explained in more detail below, the ALJ does provide additional support for his conclusions. Further, the ALJ is specifically referring to "the extent of limitation experienced by Plaintiff," not merely whether she has any limitations at all.

The remainder of the ALJ's discussion of Dr. Wilcher's opinion focuses almost exclusively on two of the factors—supportability and consistency. He first addresses the supportability factor: "Such a drastic degree of limitation is in no way supported by convincing objective medical evidence or clinical findings." (Doc. #7, *PageID* #593); *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). He explained, "Clinical testing revealed no abnormalities of a significance that would account for the degree of limitation suggested by Dr. Wilcher (see, for example, the MRI scan at Exhibit 6F)." (Doc. #7, *PageID* #593) (citation omitted). Substantial evidence supports the ALJ's reasoning. The MRI scan he refers to is of Plaintiff's lumbar spine. It revealed "degenerative disc disease with facet arthropathy with no significant central lateral recess or foraminal encroachment" and "no cord or exiting nerve root compromise is seen." (Doc. #6, *PageID* #507) (original in all capital letters).

Instead of being supported by medical signs, the ALJ found that Dr. Wilcher's conclusions are "quite general with purported limitations attributed to nothing more

specific than pain complaints (versus an actual medically determinable etiology)").  (Doc. #7, *PageID* #593); *see* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").  This is reflected in Dr. Wilcher's responses to two separate medical-impairment questionnaires.  When asked to identify Plaintiff's symptoms, Dr. Wilcher indicated "back [and] joint pain" and, when asked for his most recent findings, he responded, "Pain shoulder, knees, back."  (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027).

Next, the ALJ addressed the consistency factor:  The ALJ correctly observed that Dr. Wilcher's treatment notes are not consistent with his opinions as they "show no limitations in range of motion of either upper extremity, normal gait, and no indication of lower extremity abnormality as of April 2013."  (Doc. #7, *PageID* #593) (citation omitted); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

The ALJ also found that Dr. Wilcher's opinions were internally inconsistent: "Dr. Wilcher … indicated that his treatment included exercise which would seem to contradict his other conclusions of rather significant exertional limitations (i.e., an inability to stand longer than 30 minutes at a time or to sit longer than two hours at a time or an inability to work longer than a total of four hours per day)."  (Doc. #7, *PageID* #593).  Plaintiff, however, disagrees, asserting that this finding by the ALJ "makes no reasonable sense whatsoever as there is no indication that the exercise recommended involved any activity which would be incompatible with Dr. Wilcher's functional conclusions."  (Doc. #8,

*PageID* #1043).  She sees no conflict between "Dr. Wilcher's recommendation that Plaintiff try light exercise" and his opinion that she can stand for thirty minutes at one time, sit for two hours at one time, and work for four hours per day.  *Id.*  But Dr. Wilcher did not "recommend" "light exercise"; he indicated on two medical-impairment questionnaires that Plaintiff's treatment included exercise.  (Doc. #6, *PageID* #516); (Doc. #7, *PageID* #1027).  Given Dr. Wilcher's lack of explanation, it was reasonable for the ALJ to find the assessments as internally inconsistent.

Plaintiff correctly observes that the ALJ did not discuss all of the factors—most notably, Dr. Wilcher's incredibly long treatment relationship with Plaintiff—beginning in 1999 or before.  *See* 20 C.F.R. § 404.1527(c)(2)(i) (Generally, the longer a treating source has treated you …, the more weight we will give to the source's medical opinion.").  Yet, he only saw Plaintiff once in 2013, twice in 2014, twice in 2015, and once in 2016.  (Doc. #6, *PageID* #s 427-61, 509-11); (Doc. #7, *PageID* #s 1008-19); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, … the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").  Nonetheless, the ALJ's failure to mention their extensive relationship is not fatal in this case.  The ALJ provided good reasons, as the Regulations require, for not placing little weight on Dr. Wilcher's opinions.

*Dr. Patel*

ALJ Kenyon correctly set forth the criteria for evaluating a treating physician's opinion and then concluded that "the opinion of treating psychiatrist Dr. Patel that the claimant experiences any worse than 'moderate' limitation in any aspect of her mental

functioning capabilities cannot be given controlling or even deferential weight (and is, in fact, entitled to little weight whatsoever)."  (Doc. #7, *PageID* #587).  The ALJ gave several reasons.  He reasonably observed that Plaintiff's level of mental health treatment "is clearly not indicative of a 'marked' degree of mental impairment."  *Id.*; *see Bolton v. Comm'r of Soc. Sec.*, No. 17-6129, 2018 WL 1773504, at *2 (6th Cir. Apr. 12, 2018) ("And the ALJ reasonably discounted the opinion of Dr. Ganshirt because … the extreme severity of the proposed limitations was not supported by the medical evidence in the record, which generally showed that Bolton received conservative mental-health treatment ….").  The record shows that her treatment began in March 2013 and ended in August 2014.  (Doc. #6, *PageID* #477); (Doc. #7, *PageID* #911).  The record does not reveal why she stopped attending treatment.

The ALJ also found that a moderate level of limitation is consistent with the moderate-level GAF scores assigned by both Dr. Patel and Dr. Jones.  He observed that these scores were assigned "over an extended period of time thereby providing a plausible longitudinal picture of the degree of limitation experienced by [Plaintiff]." (Doc. #7, *PageID* #s 586-87).  The ALJ is correct to the extent that between July 2013 and August 2014—at six appointments—Dr. Patel assigned a GAF score of 55.  (Doc. #6, *PageID* #s 518, 523, 566, 573); (Doc. #7, *PageID* #s 974, 980-81, 986).  In January 2013, Dr. Jones assigned a symptom GAF of 53.  *Id.* at 471.  Nevertheless, the recent rejection of the GAF scale by the psychiatric professionals who created it and its lack of direct correlation with the requirements of the Commissioner's mental disorders listings cast too dark a shadow over its reliability for it to serve as a reasonable basis for rejecting a

16

treating psychiatrist's opinion. *See DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. App'x 411, 415 (6th Cir. 2006) ("the Commissioner 'has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.''") (quoting *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6 n. 5, 133 F. App'x 684 (11th Cir. June 2, 2005); 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)); Diagnostic and Statistical Manual of Mental Disorders at p. 16 (Am. Psych. Ass'n, 5th ed. 2013) (DSM-V) (eliminating GAF upon the recommendation "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice").

The ALJ's reliance on GAF scores, however, is not fatal to his evaluation of Dr. Patel's opinion because he provided several additional good reasons. For instance, the ALJ assigned little weight to Dr's Patel's opinion that Plaintiff "may experience 'marked' limitation in some aspects of her mental functioning capabilities related to concentration and attention …" because "upon repeated examination, [Plaintiff] displayed normal mood and affect with normal attention span and concentration." (Doc. #7, *PageID* #588) (citing Exhibits 1F at 22; 3F at 60; 5F at 13; [Doc. #6, *PageID* #s 341, 418, 487] 12F at 6; 13F at 5, 7, 10 [Doc. #7, *PageID* #s 992, 1011, 1013, 1016]). The exhibits cited by the ALJ vary significantly from each other in both date and source. For example, on October 18, 2011, at the Grandview Hospital Emergency Department, George M. Kaiser, D.O., noted that Plaintiff "has a normal mood and affect. Her behavior is normal. Judgment

and thought content normal." (Doc. #6, *PageID* #341). Likewise, on October 12, 2015, Plaintiff's treating physician, Dr. Wilcher, indicated that Plaintiff was "alert and cooperative; normal mood and affect; normal attention span and concentration." (Doc. #7, *PageID* #1011).

Further, the ALJ assigned Dr. Patel's opinion that Plaintiff had moderate limitations in social functioning "little weight" because "there is no persuasive evidence to corroborate such findings …." *Id.* at 588. The ALJ correctly observes that Dr. Jones, an examining psychologist, found that there was no indication Plaintiff would have difficulty relating to others in a work environment. *Id.* (citation omitted). Likewise, "Upon repeated examination, [Plaintiff] displayed normal mood and affect and was characterized as cooperative. *Id.* at 588 (citations omitted). This constitutes substantial evidence in support of the ALJ's finding.

*Dr. Jones*

Plaintiff contends that the ALJ erred in weighing Dr. Jones's opinion because he did not reference or apply the regulatory factors and "does not make it clear to what specific extent he is rejecting and/or embracing the psychological examiner's opinion." (Doc. #8, *PageID* #1047). Although the ALJ is first somewhat unclear—assigning Dr. Jones's opinions "some weight but only to a limited extent and in particular areas"—he then provides a more detailed analysis. (Doc. #7, *PageID* #585). He explained, "her conclusion that [Plaintiff] has no apparent difficulty coping with work stress is plausible and is afforded moderate weight as is the extent of limitation (mild-to-moderate) she found to exist in [Plaintiff's] capacity to maintain concentration, persistence, or pace. *Id.*

at 585.  Additionally, he later observed that the record-reviewing psychologists' opinions were consistent with Dr. Jones's opinion.  *Id.* at 588.

Further, the ALJ "rejected" Dr. Jones's finding that Plaintiff "has mild mental retardation (now classified as 'intellectual disability') …."  *Id.* at 585.  He later explains Dr. Jones's opinion is the only one in the record suggesting intellectual disability.  Indeed, Plaintiff's psychiatrist, Dr. Patel, did not diagnose mental retardation or intellectual disability.  *Id.* at 589.  Further, as discussed below, the record-reviewing psychologists diagnosed "borderline intellectual functioning based on a lack of evidence of any adaptive deficits in functioning during the developmental period.  *Id.* at 589 (citations omitted).  The ALJ found that "[e]ven a diagnosis of borderline intellectual functioning may be suspect but, giving [Plaintiff] the maximum benefit of doubt (and in view of her limited academic achievement), such a diagnosis will be accepted based on the medical source opinion evidence of DDD psychologists Dr. Rivera and Dr. Johnston …."  *Id.* at 589.  Together, this shows that the ALJ reasonably weighed Dr. Jones's opinion.

*Dr. Danopulos*

Turning to Dr. Danopulos's opinion, the ALJ assigned his opinions "great weight" but only "[t]o the extent that [his] findings support the residual functional capacity assessment described at Finding No. 5."  *Id.* at 584.  Plaintiff contends that the ALJ "never even minimally purports to weigh [Dr. Danopulos's opinion] under the regulatory factors."  (Doc. #8, *PageID* #1046).

The ALJ did, however, discuss support.  (Doc. #7, *PageID* #584); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").  Specifically, the ALJ found, "The findings of Dr. Danopulos support the conclusions reached herein with regard to the disposition of various 'severe' and 'non-severe' physical impairments as discussed above. … This is because x-rays taken in conjunction with his examination showed only 'mild' abnormality which would certainly not preclude the function-by-function limitations imposed at Finding No. 5."  (Doc. #7, *PageID* #584).

Additionally, the ALJ interpreted Dr. Danopulos's conclusion that Plaintiff's "ability 'to do any work-related activities is affected from the combination of her lumbar spine and left knee early arthritic changes and her cervical spine arthralgias'" as "reflect[ing] a capacity for the residual functional capacity set forth at Finding No. 5.  It has no meaning beyond that interpretation …." *Id.*  Plaintiff asserts that the ALJ's interpretation of Dr. Danopulos's opinion is "nonsensical and entirely unsupported." (Doc. #8, *PageID* #s 1046-47).  "The parallel ALJ [Kenyon] attempts to draw between this statement and his residual functional capacity finding is a false one which plainly 'stretches Dr. Danopulos' opinions too far.'" *Id.* at 1047 (quoting *See Knapke v. Comm'r of Soc. Sec.*, Case. No. 3:13-cv-00399 *17 (S.D. Ohio, Jan. 6, 2015) (*Report & Recommendations adopted over objections*)).  Instead, Plaintiff contends that Dr. Danopulos's statement "does not provide any meaningful guidance as to Plaintiff's

specific ability to lift, stand, or execute work relevant postures and therefore cannot be said to support the ALJ's non-disability finding." *Id.* at 1047 (citations omitted).

Although Plaintiff is correct that Dr. Danopulos's opinion is vague, it does not conflict with the ALJ's residual functional capacity assessment. Dr. Danopulos noted normal but painful motions of Plaintiff's left knee and x-rays showed mild degenerative changes. (Doc. #6, *PageID* #349). She had slightly restricted and painful motions in her lumbar spine and x-rays revealed mild degenerative changes. *See Panella v. Berryhill*, No. 3:16cv116, 2017 WL 3868806, at *2 (S.D. Ohio Sept. 5, 2017) (Rice, D.J.) ("Dr. Danopulos never opined that Plaintiff's impairments would prevent[] Plaintiff from working at all …."). Accordingly, it was reasonable for the ALJ to find that Dr. Danopulos's opinion supports the ALJ's residual functional capacity assessment.

### *Drs. Rivera and Johnston*

Plaintiff contends that the ALJ "purports to credit those portions of the opinions which favor his own findings and reject those which are contrary thereto primarily secondary to assertions that Plaintiff's day-to-day activities supports such a parsing." (Doc. #8, *PageID* #1047). In doing so, according to Plaintiff, the ALJ "entirely fails to both account for the context for said activities provided by the record and also neglects that the relevant question for mental health functional evaluation is the claimant's ability to perform relevant vocational activities on a *sustained basis*." *Id.* at 1048 (citing *Gayheart*, 710 F.3d at 377-78).

Although Plaintiff is correct that the ALJ does rely on some of Plaintiff's daily activities, she omits that the ALJ provided additional reasons as well. For example, the

ALJ assigned substantial weight to Dr. Rivera's opinion that Plaintiff has mild limitations in her ability to do activities of daily living.  (Doc. #7, *PageID* #587).  He concluded it was plausible and explained that Plaintiff helps to maintain a household, is able to operate a motor vehicle, and uses a computer.  However, the ALJ also accurately observed that Plaintiff reported to Dr. Jones that she takes care of her three-year-old granddaughter.  *Id.*; *see* (Doc. #6, *PageID* #470).

The ALJ likewise assigned substantial weight to Dr. Rivera and Dr. Johnston's opinion that Plaintiff experiences mild limitations in her ability to maintain social functioning.  (Doc. #7, *PageID* #588).  He explained that their opinions "represent an accurate estimation of the degree of limitation experienced by [Plaintiff.]"  *Id.*  As explained above, the ALJ found that Dr. Jones's opinion was consistent with that of the record-reviewing psychologists and with Plaintiff's treatment record.  *Id.*  Thus, the ALJ provided good reasons, supported by substantial evidence, for crediting the record-reviewing psychologists' opinions.

### Drs. Cruz and Mirvis

Plaintiff contends that the ALJ failed to "substantively weigh" Dr. Cruz and Dr. Mirvis's opinions "with anything more than an unexplained assertion that they merit "moderate weight."  (Doc. #8, *PageID* #1048).  But that is not entirely accurate.  The ALJ—observing that "the essential components of both DDD opinions describe a range of 'medium' exertion …"—found that a residual functional capacity for "medium" exertion was reasonable and an "accurate estimation" of Plaintiff's abilities.  (Doc. #7, *PageID* #592).  He explained that "[a]ny documented physical abnormalities are, at

worst, mild." *Id.* (citations omitted). Further, she received very minimal treatment for her knee, had a normal gait, and revealed no evidence of swelling. This constitutes a good reason for assigning the record-reviewing physicians' opinions moderate weight.

In summary, although Plaintiff maintains that ALJ Kenyon should have weighed the opinion evidence differently, substantial evidence supports his consideration of those opinions. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The substantial evidence standard presupposes that there is a zone of choice within which the decision maker can go either way, without interference by the courts. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). The ALJ's explanation for why he assigned Dr. Wilcher's and Dr. Patel's opinions little weight was within the zone of reasonable choices. He likewise provided a reasonable explanation, supported by substantial evidence, for how and why he weighed the opinions of the state-agency consulting and record-reviewing psychologists and physicians. Accordingly, Plaintiff's challenges to the ALJ's review of the medical source opinions lack merit.

**B.    Mental Residual Functional Capacity**

Plaintiff asserts that ALJ Kenyon's residual functional capacity finding fails to reasonably reflect Plaintiff's mental impairments. She also contends that all of the medical opinions of record "endorse[] that Plaintiff has limitations which extend beyond those identified by ALJ [Kenyon]. (Doc. #8, *PageID* #1049).

The ALJ provided a reasonable and straight-forward explanation for his findings regarding Plaintiff's mental limitations:

[Plaintiff's] capacity to work is also reduced by the effects of mental impairments of affective (depressive) disorder and borderline intellectual functioning. For the reasons cited at Finding No. 3, it is found that [Plaintiff] experiences "mild" limitation in her ability to do activities of daily living, "mild" limitation in her ability to maintain social functioning, and "moderate" limitation in her ability to maintain concentration, persistence, or pace. This level of psychological limitation is found to translate to the following specific functional restrictions. [Plaintiff] is limited to performing unskilled, simple, repetitive tasks. These restrictions take into account any potential limitations that might result from documented mental impairment. … For example, it was indicated by Dr. Johnston and Dr. Rivera that [Plaintiff] "appears to be capable of understanding and recalling simple 1-3 step instructions" …. That finding is adequately addressed by restricting [Plaintiff] to unskilled, simple, repetitive tasks. A restriction for no work involving fast pace and a restriction for possible inability to "respond well to rapidly changing work environments … are deemed non-applicable because [Plaintiff's] level of depression and complaints attributed to mental disorder are not objectively supported to an extent that would necessitate such limitations. Note, for instance, that examining psychologist Dr. Jones saw no evidence that [Plaintiff] would experience any difficulty coping with stress ….

(Doc. #7, *PageID* at 594 (internal citations omitted). Further, as explained in detail above, the ALJ reasonably weighed the medical evidence of record.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The ALJ's non-disability decision be affirmed; and

2.    The case be terminated on the Court's docket.

July 31, 2018                              *s/Sharon L. Ovington*
                                          Sharon L. Ovington
                                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).